AO 91 (Rev. 11/11)   Criminal Complaint

FILED
May 27 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| ZHANG LI | ) | Case No.   3-21-mj-70909 MAG |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

In or about the date(s) of   2015 through in or about Jan. 2020   in the county of   San Francisco   in the   Northern   District of   California  , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1343, 1346 | Honest Services Wire Fraud |
| | Maximum Penalties: 20 years' imprisonment |
| | $250,000 fine or not more than the greater of twice the gross gain or twice the gross loss |
| | 3 years' supervised release |
| | $100 special assessment |

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent Tyler A Nave

☑ Continued on the attached sheet.

Approved as to form   /s/
                     AUSA Scott Joiner

/s/ via telephone
*Complainant's signature*

Tyler A. Nave, Special Agent, FBI
*Printed name and title*

Attested to by the applicant by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date:   05/27/2021

*Judge's signature*

City and state:   San Francisco, CA

Hon. Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

**FILED**

May 27 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

3-21-mj-70909 MAG

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) AFFIDAVIT IN SUPPORT OF CRIMINAL |
| Plaintiff, | ) COMPLAINT |
| v. | ) **UNDER SEAL** |
| ZHANG LI, | ) |
| Defendant. | ) |

AFFIDAVIT
FILED UNDER SEAL

TABLE OF CONTENTS

I.  INTRODUCTION AND AGENT QUALIFICATIONS ................................................................1
II. APPLICABLE LAW ................................................................................................................3
III. FACTS ESTABLISHING PROBABLE CAUSE ......................................................................4
    A.  Individuals ........................................................................................................................4
    B.  Overview ..........................................................................................................................5
    C.  The Corrupt Relationship Between WONG and NURU ......................................................6
    D.  ZHANG, WONG, NURU, and 555 Fulton ........................................................................6
IV. CONCLUSION .......................................................................................................................14
V.  REQUEST FOR SEALING ....................................................................................................14

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Tyler A. Nave, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby depose and state the following:

## I. INTRODUCTION AND AGENT QUALIFICATIONS

1. I submit this affidavit in support of a criminal complaint against ZHANG LI. As set forth below, there is probable cause to believe that ZHANG conspired with Mohammed NURU and others in a scheme to deprive the people of San Francisco of the honest services of Mohammed NURU, the former Director of San Francisco Public Works, in violation of Title 18, United States Code, Sections 1343, 1346 and 1349.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am a Special Agent of the FBI and have been so employed since March 2009. I am sworn and empowered to investigate criminal activity involving violations of federal law. I am currently assigned to FBI's San Francisco Division Public Corruption Squad, which investigates abuse of public office in violation of criminal law, which includes fraud, bribery, extortion, conflicts of interest, and embezzlement. My investigative experience includes, but is not limited to: conducting wire communication interceptions; interviewing subjects, targets and witnesses; executing search and arrest warrants; handling and supervising confidential human sources; conducting surveillance; and analyzing phone records and financial records.

3. During my employment with the FBI, I have received formal classroom and field training at the FBI Academy in Quantico, Virginia and graduated from the New Agent Training program. My training and experience includes, but is not limited to, public corruption, hate crimes, human trafficking, and foreign counter-intelligence. I have also received additional formal and on-the-job training from the FBI, as well as from the United States Attorney's office and other federal agents who have done extensive work in the areas of financial crimes and public corruption. I have participated in several investigations involving public corruption, bribery, and fraud, and I have been the lead agent on several of those cases. I have worked on multiple wiretaps while investigating public corruption, white-collar

crime, and national security cases. I have received formal training in wiretaps at the FBI academy in Quantico, Virginia as well as on the job training while working on wiretaps in active investigations in multiple field offices.

4. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including, but not limited to, physical and electronic surveillance, witness interviews, various types of infiltration to include confidential human sources, and cooperating sources. I have utilized pen register and trap and trace devices, mail covers, pole cameras, stationary video recording vehicles, undercover operations, and audio and audio/video recording devices.

5. I make this Affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources, among others:

   a. my experience investigating honest services wire fraud, bribery, and other illegal activity relating to public corruption;
   b. oral and written reports about this investigation that I have received from members of the FBI;
   c. physical surveillance conducted by the FBI, the results of which have been reported to me either directly or indirectly;
   d. information obtained from undercover agents;
   e. recorded conversations; and
   f. confidential human sources.

6. Because this affidavit is being submitted for the purpose of establishing probable cause in support of the requested Complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause and to provide the Court with an overview of the facts that establish ZHANG conspired with NURU and others to deprive the public of their right to the honest services of NURU.

7. Unless otherwise indicated, where actions, conversations, and statements of others are described below, they are related in substance and in part. In addition, unless otherwise noted, wherever

in this Affidavit I assert a statement was made, the information was provided by another FBI agent, law enforcement officer, recording, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have reviewed.

8. The conversations I summarize below were derived in large part from various intercepted communications. Collectively, these communications were documented in FBI reports and summaries. These reports and summaries describe recorded conversations involving subjects of the investigation, during which the subjects at times use code words and/or cryptic language to disguise conversations about their criminal schemes and related activities. The reports are summarized based on agents' interpretations of the conversations. Some of these reports and summaries contain interpretations of coded words, cryptic language, and vague identifiers. It may be that subsequent review of the recorded conversations and verbatim transcripts may show changes from the summaries initially prepared. Quotations from the recordings are based on informal transcriptions of portions of certain key recordings, which may not be exactly the same as formal transcriptions that are later prepared.

## II. APPLICABLE LAW

9. The elements of a conspiracy to engage in honest services wire fraud in violation of 18 U.S.C. § 1349 are as follows:

- There was an agreement between two or more people to engage a in scheme or plan to deprive the people of San Francisco of the honest services of Mohammed NURU; and

- ZHANG joined in that agreement knowing of at least one of its objects and intending to help achieve it.

10. The elements of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, are as follows:

- The defendant devised or knowingly participated in a scheme or plan to deprive the people of San Francisco of their right of honest services;

- The scheme or plan consists of a bribe or kickback in exchange for the defendant's services. The "exchange" may be express or may be implied from all the surrounding circumstances;

- The public official owed a fiduciary duty to the people of San Francisco;

- The defendant acted with the intent to defraud by depriving the people of San Francisco of their right of honest services;

- The defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing, a person's acts; and

AFFIDAVIT
FILED UNDER SEAL                                      3

- The defendant used, or caused someone to use, interstate wires to carry out or to attempt to carry out the scheme or plan.

11. Honest services wire fraud does not require the bribe or kickback be completed, or that official action was actually taken, because the criminal act is the creation of a "scheme" to defraud. *See Pasquantino v. United States*, 544 U.S. 349, 371 (2005) ("the wire fraud statute punishes the scheme, not its success") (citations, quotations omitted); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986) (for mail and wire fraud, it is not necessary to show that the scheme was successful or that the intended victim suffered a loss or that the defendants secured a gain); *see also United States v. Kimbrew*, 944 F.3d 810, 815 (9th Cir. 2019) (liability for bribery of a public official, in violation of 18 U.S.C. § 201(b)(2)(A), "does not depend on an outcome; the offense is complete at the moment of agreement, and that agreement need not even be accompanied by the bribe recipient's genuine intentions to follow through."). In addition, "anyone who knowingly and intentionally participates in the execution of [a] fraudulent scheme comes within the prohibition of the mail and wire fraud statutes regardless of whether the defendant devised the scheme." *United States v. Holden*, 908 F.3d 395, 400 (9th Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 1645, 203 L. Ed. 2d 918 (2019).

### III.  FACTS ESTABLISHING PROBABLE CAUSE

### A.  Individuals

12. At all times material to this complaint, ZHANG was the chairman, co-founder, and chief executive officer of R&F Properties Co. Ltd., a real estate holdings and development company based in Guangzhou, China. R&F Properties Co. Ltd. does business in the United States through a domestic affiliate, Z&L Properties, Inc., which is a real estate holdings and development company based in Foster City, California. Among other projects, Z&L Properties was responsible for a large, multimillion-dollar mixed-use residential/commercial development located at 555 Fulton Street in San Francisco, CA.

13. At all times material to this complaint, Walter WONG was a contractor, developer and "permit consultant," as that term is defined in the San Francisco Campaign and Governmental Conduct Code. WONG owned and operated numerous construction and construction-related companies from his offices in San Francisco. Through these companies, WONG did business with numerous San Francisco agencies, including San Francisco Public Works (DPW). WONG also served as a "permit consultant"

for Z&L Properties, on 555 Fulton as well as other Z&L projects.  WONG was charged in a Criminal Information on June 23, 2020, with Conspiracy to Commit Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349, and pled guilty on July 6, 2020.  WONG's guilty plea required him to provide truthful information, documents, and testimony and if WONG complies with those requirements and provides substantial assistance in the investigation and prosecution of others then the government may recommend a reduction in WONG's sentence.

14. At all times material to this Complaint, Mohammed NURU was the Director of the Department of Public Works (DPW) for the City and County of San Francisco (the "City"). Based on publicly available data, the total DPW budget regularly encompassed hundreds of millions of dollars. As Director, NURU had great influence over contracts and construction projects granted by DPW.  He also had significant influence with other City departments, including but not limited to the San Francisco Department of Building Inspection (DBI).  As a public official, NURU owed the public a fiduciary duty to provide honest services in his capacity as Director of DPW.  While still serving as Director of DPW, NURU was charged by Criminal Complaint with Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346) on January 15, 2020, and by a separate Criminal Complaint with False Statement in violation of 18 U.S.C. § 1001 on January 28, 2020.

**B.    Overview**

15. WONG and NURU had a long-standing corrupt relationship since approximately 2008, whereby WONG provided NURU with gifts, in exchange for which NURU took official acts in his capacity as director of DPW that benefited WONG.  ZHANG became a part of this corrupt relationship in approximately 2015, when ZHANG hired WONG, through Z&L Properties, to be a "permit expediter" for a project that ZHANG was developing at 555 Fulton Street in San Francisco.  By 2018, the project had run into multiple approval problems with the City and construction had stalled.  WONG approached NURU on behalf of ZHANG seeking assistance in getting permits and approvals for 555 Fulton.  In September of 2018, WONG paid for NURU and one of NURU's family members to travel to China on vacation.  Once in China, ZHANG provided NURU and his family member with free high-end accommodations and numerous other gifts.  In exchange, ZHANG provided NURU with a list of items he wanted NURU to help with so that the 555 Fulton project could receive necessary approvals from the

city. NURU assured ZHANG he would help.

### C. The Corrupt Relationship Between WONG and NURU

16. WONG and NURU had a long-standing corrupt relationship, whereby WONG provided NURU with gifts, in exchange for which NURU took official acts in his capacity as director of DPW that benefited WONG.[1] This relationship, confirmed by WONG during his guilty plea and in interviews with law enforcement, began approximately in 2008 when WONG installed a gate at NURU's home in San Francisco for free. WONG intended for the free work to lead to future business with DPW and the City. It did. Over the next several years, WONG continued to perform construction services for free or at significantly reduced cost for NURU, partly at NURU's home in San Francisco, but primarily at a vacation ranch property that NURU was building in Colusa County on Lodoga-Stonyford Road. NURU never paid WONG or offered to pay WONG. Rather, it was understood that WONG was paying for the construction in exchange for NURU's official influence over City contracts and approvals. Between approximately 2008 and January 2020, in exchange for NURU's assistance obtaining City contracts and City approvals, WONG provided in excess of $260,000 in labor and materials for work performed on NURU's San Francisco home and Colusa County ranch. WONG also paid for home furnishings for NURU, including a chandelier and furniture. WONG also paid for NURU to travel to China on numerous occasions and South America on one occasion, paying for NURU's travel expenses and reimbursing NURU for the cost of his international business flights in cash. One of these trips to China is discussed in further detail below.

### D. ZHANG, WONG, NURU, and 555 Fulton Street

17. In approximately 2015, ZHANG and Z&L Properties began developing a mixed-used residential/commercial project located at 555 Fulton Street in San Francisco. Around the same time, WONG was hired by ZHANG and Z&L Properties to work as a "permit consultant" on the 555 Fulton project.

18. Between 2016 and 2019, ZHANG, who was based in China, flew to San Francisco

---

[1] As noted earlier, WONG is cooperating with the government pursuant to a cooperation plea agreement and is seeking sentencing consideration from the Court in the event that he provides substantial assistance to the investigation.

AFFIDAVIT                                      6
FILED UNDER SEAL

regularly, typically by private jet, to meet with WONG to get updates on the project. On these occasions, ZHANG and WONG usually met over dinner. Often these dinners were also attended by one of ZHANG's employees, EMPLOYEE 1, who worked for Z&L Properties. WONG usually invited NURU to these dinners, both because of their long-standing corrupt relationship, and because NURU was involved in his official capacity as DPW Director with approvals and permits necessary for 555 Fulton and other projects. WONG also invited other San Francisco public officials who could assist ZHANG with the 555 Fulton project, including, but not limited to, a former Mayor of San Francisco and the Director of San Francisco's Department of Building Inspections (DBI). WONG typically chose the locations for these dinners. EMPLOYEE 1 typically picked up the tab. NURU never paid for his meals. During the meal, ZHANG would ask for assistance with his projects in San Francisco.

19. By approximately 2017, numerous delays and problems had arisen with the development at 555 Fulton Street.

20. At least as early as February of 2018, during the same period that NURU was attending dinners with ZHANG and WONG, WONG asked NURU for NURU's assistance in obtaining approvals and permits relating to 555 Fulton. For example, on February 26, 2018, WONG and NURU exchanged several emails. Initially, the topic of discussion was free construction that WONG was performing on NURU's vacation ranch property in Lodoga, California. Later, the topic of discussion turned to specific assistance that WONG needed from NURU on 555 Fulton:

    a. At 2:32 P.M., WONG emailed NURU plans for NURU's vacation home, identifying particular sections of the living area and asking "is this the area you want pine for ceiling".

    b. At 8:41 P.M., WONG emailed NURU saying "we need to know sq. ft and slope to calculate the sq. ft of pine."

    c. Also at 8:41 P.M., WONG emailed NURU asking NURU's "assistance on an important piece of legislation for 555 Fulton Street" that had been submitted to the San Francisco Board of Supervisors, allowing for a grocery store to be located at 555 Fulton Street.

21. Later that evening, the topic of discussion turned to the outstanding tuition balance that one of NURU's family members owed at a San Francisco academic institution:

      a. At 10:01 P.M., NURU forwarded WONG an email that NURU had received, indicating that one of NURU's family members had a tuition balance at an academic institution in San Francisco. NURU also sent WONG a message on an encrypted messaging application. The message contained a forwarded message from NURU's family member who showing the outstanding tuition balance, and advising that NURU's family member would no longer be able to attend classes there if the balance was not resolved. In the message to WONG, NURU asked WONG, "Can you help with this."

      b. At 10:11 P.M., WONG sent NURU an email with an attachment showing designs for the construction of NURU's vacation home. The plans were titled "Project: LODOGA RANCH"

      c. At 10:22 P.M., WONG sent NURU further attachments relating to architectural drawings, structural drawings, and electrical drawings for NURU's vacation home.

22. Agents have been unable to determine at this time whether NURU took any specific official acts with respect to the grocery store legislation at 555 Fulton. WONG has confirmed to agents, however, that he provided items of value to NURU with the intent to obtain NURU's official assistance in instances like this, and specifically in connection with 555 Fulton. WONG's statements are corroborated by the fact that WONG asked NURU for assistance on 555 Fulton while simultaneously discussing construction on NURU's vacation home and resolving NURU's family member's tuition budget.

23. Later that year, in October of 2018, NURU traveled with WONG to China. NURU also took one of his family members on this trip with him. As was typical of their relationship, NURU paid for his international business class airfare by check, and WONG reimbursed him in cash, so that it appeared that NURU had paid for his travel himself. While in China, ZHANG met with NURU several times. ZHANG paid for NURU's accommodations, domestic transport, meals, and other expenses, and also provided NURU with numerous gifts while in China. In exchange, ZHANG provided NURU with a list of items that ZHANG needed NURU to help with in order to get necessary City approvals for 555 Fulton.

AFFIDAVIT
FILED UNDER SEAL

8

24. NURU described his trip to China in detail to his girlfriend, Sandra ZUNIGA[2], when he returned to the United States. In an intercepted telephone call on November 4, 2018, at approximately 9:21 P.M., NURU told ZUNIGA that unlike on the way to China, where he flew in first class, this time NURU flew business class back to San Francisco. NURU began by telling ZUNIGA about his wealthy friend ZHANG, who lived in China, and how NURU and WONG stayed at ZHANG's resorts during their vacation. NURU said, "Oh boy, oof. We had a great time. Are you kidding? We had a great time. It was great. The last few days was just, it was almost, it was almost a little scary because we had agents you know, like when we went to the to, outside our hotel room, they had guards outside our hotel room. (laughs)… You know my friend that has the plane?... Well I have a friend that has a, he's the fifth richest guy in China… I know him through [WONG], but anyway, so he's really rich, I mean, he's like, anyway we went to, we had uh we had dinner with him on, what day was that? On Friday, oh no we had lunch with him on Friday and they ask 'so hey, what are you guys doing for the rest?' We told him we were going to this little hot spring town where they have these hot springs and stuff… And he's like 'No, you're going to my hot spring.' [Unintelligible] his people on the phone making phone calls and he has his [unintelligible] he says 'My van is outside to take you to my resort'… And we get there and they're like all these people, all these like agents with things in their ear and stuff all waiting for us. We like 'oh shit, what's going on [WONG]?' (UI)… Yeah, thing is we get there, they take us to our rooms and everything and they're, everybody's in their room and then as soon as I come out, they're like still outside our room. I'm like 'Oh man, what's going on?' And then they're like 'Uh, in ten minutes we're going to go take a tour of the whole place' You know, then we took a whole tour and everything. They gave us (unintelligible) it was a big, they have like a whole community center and basketball courts, swimming pools, yoga… Yeah, he owns the whole, the whole spa and the hotel. Yeah and he has many. He has a hundred and five, five-star hotels in China… Yeah, we stayed, we stayed in uh we

---

[2] ZUNIGA was at the time the Director of the City of San Francisco's Fix-It Team and the Director of the Mayor's Office of Neighborhood Services. She was charged by Information with Money Laundering conspiracy (18 U.S.C. § 1956(h)) on March 8, 2021. She pleaded guilty on March 18, 2021 and is cooperating with the government pursuant to a cooperation plea agreement and is seeking sentencing consideration from the Court in the event that she provides substantial assistance to the investigation. ZUNIGA has confirmed that she was aware of NURU's wide ranging honest services fraud scheme and helped launder the proceeds of that fraud for NURU.

AFFIDAVIT                                              9
FILED UNDER SEAL

stayed at uh Seven Star Hotel, he owns it, Conrad, and then we stayed at the Park Hyatt, he owns that one.  And the last time I went with grandma we stayed at the Ritz-Carlton, yeah… Yeah actually, he even told us, he told us, you know, did I send you some pictures of like this mansion that we went to?" NURU continued, "Oh, no this was uh, anyway, we went to this mansion.  He has like a mansion, it's like the White House. It's worth billions of dollars, like (unintelligible) and art and Chinese paintings… This is the guy that uh, bought the, did I tell you about a guy that bought 2,000 acres in [Bay Area city]?  He wants to build…  He wants to build a [unintelligible]…  Anyway, he's got a lot of real estate in America. He the guy we uh, when we had we had dinner at his house, we had like the Vice President of [Foreign Country 1] there, when we had, we sat at…  Yeah that's ZHANG's house, but apparently he doesn't live there because it's too, you know, he lives on, he has four floors on the top of the Ritz-Carlton.  He told me the other day, when we had lunch with him.  He says 'Oh I live here.  [Unintelligible] four floors on the top here.'  I was like, 'Oh.' 'This is where I live, but people think I live in that place.  I don't live in that place.' (laughs)."

   25. NURU then said he uses encrypted messaging applications to communicate with ZHANG directly.  NURU told ZUNIGA about how he is helping ZHANG.  NURU said, "I'll send you a picture.  He's a very nice guy.  We're helping him, I'm helping him with a project here, San Francisco. So whenever he comes, I always go to see him. I didn't know and I know he has this plane, I didn't know that, how big he was until I got to China."  NURU then listed some of the gifts and benefits he received from ZHANG, "No we uh, we uh, we so when we arrive, we had a dinner with him and that night he gave us a tour of his house, uh me and uh [individual from Foreign Country 1] and everybody.  His house, his house is just like a museum.  He likes art.  He's got like, in fact, he gave us, he gave us some stone.  I don't know how much they're worth, I, you know, I put them in the ship to, I shipped them you know, they're gonna come in the ship.  They're tons of money.  I don't know what he, he he brought it to us.  He gave me one and [WONG] one and he had like a little flashlight and he was saying 'look at this, look at that.'  He was showing things, I don't know what he was (laughs)…  A little bit, oh oh let me tell you this.  The night we were at his house, the drinks that we drank… that bottle was worth ten thousand dollars…  Yeah, it's Maotai, but it's fifty-year-old Maotai…  Yeah, and then and then on Saturday when we had lunch with him again, the bottle of wine was worth two thousand plus dollars.  It was a French

wine… I was like 'yeah' I was like 'Woh.' So I looked it up. It was like two thousand seventy dollars."

26. NURU continued to talk about the free hotels ZHANG had provided him on prior occasions. NURU said, "Yeah, but you know, this guy who stay at his hotels, you know, he's the one that gave us the hotel with uh grandma… Yeah this guy, you know he's, the guy with the hotels, he's been hooking, uh he's the one hooking us up… We don't, yeah, we don't uh we don't um we don't pay any hotel or anything. They take care of us. They give us good rooms and good service. You know we eat good breakfast (UI) morning… No all over the world. He owns some in America." ZUNIGA then asked, "But the ones we stayed in in South America? He owns those?" And NURU answered, "I don't know, I don't think he, I don't know if he has those ones. (UI) Yeah."

27. In the next part of the conversation NURU discussed the official actions he would take as Director of DPW to benefit ZHANG's project at 555 Fulton in San Francisco. Specifically NURU said that ZHANG, "he's the owner of uh 555 Fulton, the project that he (unintelligible)." And ZUNIGA replied, "That [WONG] was working on, yeah." And NURU continued, "Yup, and he's very upset about because he's, you know, he thinks he's lost, he's spent so much money and he's, you know, can't see the end of the tunnel… No, it's not done. So that was the meeting we had with him on Saturday. He had a whole list of things that we need to get done. We have to… He's bringing in a [grocery store] in there so they finally [unintelligible]… Yeah, so he's you know, he's got a [grocery store] going in there now. They've worked out a lease with them. He's uh trying to make sure the windows are, the windows were made in Mexico and there's some kind of defect… So we're trying to get that all resolved with the, [senior official with San Francisco Department of Building Inspection (DBI OFFICIAL 1)] shop and Planning, a whole list of things that we need to get done… Oh yeah, but I mean, he doesn't you know, he doesn't give money or anything. He lets us stay in his hotels and stuff. He makes all the arrangements for us, which is good. And nice places." Later in the conversation, NURU said that during the trip "we didn't have to do anything. We just, they just say 'Hey nine o'clock, you know, meet downstairs' and when we come there, there's a Mercedes waiting for us or a nice luxury van waiting for us." ZUNIGA asked if NURU's daughter "start[ed] to get used to it like I got used to it?" NURU responded "Oh she she got used to it. She didn't have to think about money not one day.

28. NURU's description of his arrangement with ZHANG (that he helps ZHANG with 555

Fulton in exchange for high-end accommodations and other benefits) was corroborated that same day by an encrypted message sent from NURU to ZHANG on November 4, 2018 at 1:41 AM PST. The message from NURU stated: "Thank you very much for all your generosity while we were in China. We had a great vacation and my daughter had a wonderful time. I will do my very best to see that your project gets completed. Look forward to seeing you in San Francisco when you come." ZHANG responded the next day: "You're welcome and thank you so much. Looking forward to seeing you in San Francisco."

29. Based on open-source information, 555 Fulton is a condominium complex with retail planned for the first floor. According to publicly available documents the project experienced various construction delays. When NURU referred to "Planning," I believe he was referring to the San Francisco Planning Department or San Francisco Planning Commission. These entities handle approving various parts of construction projects in the city.

30. While NURU was in China, on October 24, 2018, at approximately 12:56 pm, NURU received a call from a DPW employee. During this call, NURU asked "What's going on with 555 Fulton?" The DPW employee responded that he heard the developers were dragging their feet. NURU said "I don't think so" and continued later by saying "there's an issue with the glass…Yeah, it's the glass, something about, uh, some detail that they were concerned about that was not safe or something." The call was minimized near this point. However, based on their training and experience, agents believe NURU, in his official capacity as the Director of DPW, was using this call with a DPW employee to check on ZHANG's project in order to assist ZHANG.

31. A search of communications in NURU's personal email account indicates NURU remained involved in moving ZHANG's project forward after NURU's trip to China. These communications include: (i) a December 9, 2018 email from WONG advising NURU that DBI had provided notice that a temporary certificate of occupancy for 555 Fulton project was on hold until the project sponsor completed installation of additional items; and (ii) a February 8, 2019, email from the personal email address of DBI OFFICIAL 1 to WONG, cc'd to NURU's personal email address, indicating that the official would attend a dinner with ZHANG at a San Francisco restaurant later that month.

32.     In July of 2019, NURU and ZHANG spoke directly via an encrypted messaging application about the progress at 555 Fulton. On July 14, 2019, ZHANG wrote to NURU,

> Dear Mo Bro,
> I hope this message finds you well. I am Zhang Li, from Z&L properties Inc, My team and I would like to express our sincere gratitude to you for your support for our 555 Fulton Project. DPW's engineer team and inspection team have been working with our job site team for months, given the challenging site conditions, trying to figure out a best solution for all of us.
> A coupe [sic] of days ago, our site team met with [DPW EMPLOYEES] to discuss Birth[3] Street issue again. Unfortunately, we still haven't got a clear recommendation from your team.
> As we are approaching the final stage of the project, your continuous support is much appreciated. Given 555 Fulton is a high-profile project, we really hope we can reach a reasonable solution and DPW will sign off for final inspection soon.
> Thank you very much for your support, Bro!
> Best regards.
> Zhang Li

18 minutes later, NURU replied to ZHANG as follows:

> Hope all is well with you and the family. I will make sure we get this issue resolved this week. Will text you to let you know what the resolution is. As always it's great to hear from you. Thank you

ZHANG replied, "Thank you very much Bro!"

33.     A few days later, on July 16, 2019, ZHANG wrote NURU again with more details about the issue ZHANG and Z&L Properties sought to resolve on Birch Street. ZHANG wrote to NURU,

> Good day, here is what needs to happen with ally. 555 Fulton (Birch St): The issue with the construction on Birch Street is the street was not constructed to the grades shown on the design drawings. We are requesting that 25% of the south side of the street be reconstructed so the gutter grade is built per design. The second issue is there are existing driveways on the south side of the street that are not shown on the design drawings. Constructing to design grades will leave an unacceptable lip at the bottom of the driveway. The developer will need to reconstructed the driveways to meet standards.

34.     Agents believe that NURU responded to this message, because three hours later, ZHANG wrote to NURU, "Thank you, Bro!" In addition, approximately two weeks later, on July 30, 2019, ZHANG wrote again to NURU, referencing that NURU had indeed responded. Specifically, ZHANG wrote:

> Dear Bro,

---
[3] This appears to be a typo in the original message from ZHANG. Agents are aware that there is an alley called "Birch Street," not Birth Street, behind the 555 Fulton Project.

AFFIDAVIT                                        13
FILED UNDER SEAL

> Good morning!
> Thank you for your response last time. I appreciate all your help and coordination. As you know, we are wrapping up our project and aiming for TCO in the near future. I was wondering if you could have your team support us to collect DPW's signatures for partial TCO sign-off. Our job-site team will definitely address all the comments before the Certificate of Final Completion. If you have any other concerns, please let me know.
> Looking forward to your reply.
> Best regards
> Li

A few minutes later, NURU responded, "No problem, we will make every effort we can to make sure your project nears completion ASAP."

35. On September 15, 2019, agents observed NURU attending a party with WONG, various DBI employees, and representatives of Z & L Properties. The party appeared to be a celebration that 555 Fulton Street was in the process of successfully obtaining certain approvals. Agents believe NURU was invited to this party because of the work he did on ZHANG requests, as a result of ZHANG and WONG paying for NURU's meals, travel and accommodations, and providing other items of value to NURU.

36. ZHANG tasked NURU again on December 3, 2019. Specifically, he wrote NURU via encrypted messaging application and said,

> How are you doing Bro, 555 Fulton project has finished almost all inspection and have signed off plumbing & electrical & SFFD inspection for South Tower. Can you please help to arrange inspection ASAP? Thank you very much Bro!!

Three minutes later, NURU replied, "No problem, will make sure you get all your sign off. I will call [individual known only by first name] to follow up and get an update for you. Thank you and take care. Two days after that, NURU confirmed, "TCO signed for the south tower of 555 Fulton Street."

## IV.   CONCLUSION

37. Based on the foregoing facts and my training and experience, I respectfully submit there is probable cause to believe that ZHANG conspired with NURU, WONG, and others in a scheme to deprive the people of San Francisco of the honest services of Mohammed NURU, the former Director of San Francisco Public Works, in violation of Title 18, United States Code, Sections 1343, 1346 and 1349.

## V.   REQUEST FOR SEALING

38. Because this investigation is continuing, disclosure of the Complaint, this affidavit,

1  and/or the arrest warrant will jeopardize the progress of the investigation.  Disclosure would give the
2  targets of the investigation an opportunity to destroy evidence, change patterns of behavior, notify
3  confederates, or flee from prosecution.  Accordingly, I request that the Court issue an order sealing the
4  Complaint, this affidavit, and the arrest warrant until further order of the Court.

/s/
_____
TYLER A. NAVE
Special Agent, Federal Bureau of Investigation

Sworn to before me over the telephone and signed
by me pursuant to Fed.R.Crim.P 4.1 and 4(d)
this __27th__ day of May, 2021.

_____
HON. THOMAS S. HIXSON
United States Magistrate Judge

AFFIDAVIT
FILED UNDER SEAL

15